# STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Vermont Unit | Docket No. 116-8-14 Vtec |

Hinsdale Trust Boundary Adjustment
Application (After Remand)[1]

## Decision on the Merits

This appeal concerns a proposed boundary line adjustment for two parcels of land in the Town of Charlotte, Vermont ("Town"), the legal title to which are held by Clark W. Hinsdale, III ("Applicant"), as trustee of the Clark Hinsdale, Jr. Testamentary Trust. When the Town of Charlotte Planning Commission ("Planning Commission") denied Applicant's application for approval of a boundary line adjustment, Applicant appealed to this Court.

In addition to Applicant, who is represented in these proceedings by James H. Ouimette, Esq., the Town has appeared and is represented by Joseph S. McLean, Esq. Stephen Colvin, owner of an abutting property, initially appeared in this proceeding as a self-represented litigant. After Applicant filed a motion seeking dismissal of Mr. Colvin as a party to this appeal, Attorney William F. Ellis appeared on Mr. Colvin's behalf, initially to respond to Applicant's motion to dismiss Mr. Colvin as a party; Attorney Ellis then continued his representation of Mr. Colvin through trial.

At the initial conference, the parties advised the Court that they had already begun informal discussions, selected a mediator, and scheduled their mediation session. The Court then set a deadline for the parties to report the results of their negotiations. Prior to that deadline, Applicant and the Town entered into a stipulation that established conditions for approval of the boundary line adjustment by the Court. Mr. Colvin subsequently advised that

---

[1] The pending application was previously appealed to this Court and assigned Docket No. 174-12-13 Vtec. The Court remanded the application to the Planning Commission, per the suggestion and consent of the parties. On remand, the Planning Commission considered the original application, plus additional materials submitted by the parties. When the Planning Commission denied the remanded application, Applicant appealed to this Court; that appeal became the subject of the pending appeal (Docket No. 116-8-14 Vtec).

1

he did not agree with the terms of that stipulation. The Court therefore determined that the matter would proceed to trial, during which Applicant, the Town, and Mr. Colvin would be afforded an opportunity to present admissible evidence on whether the proposed boundary line adjustment conformed to the applicable provisions of the Land Use Regulations for the Town of Charlotte, Vermont ("Regulations"). See In re Hinsdale Trust Boundary Adjustment Application (After Remand), No 116-8-14 Vtec, slip. op. at 3 (Vt. Super. Ct. Envtl. Div. Feb 4, 2015) (Durkin, J.).

When the parties were unable, despite their best efforts, to resolve their remaining differences, the Court set the matter for a de novo hearing on May 7, 2015. The Court conducted a site visit with the parties on the morning of the trial. At the close of the evidence, the parties requested some additional time to file post-trial memoranda. Once the last of those filings were made, the matter came under advisement on June 12, 2015. Due to other commitments and administrative matters, the Court delayed the research, deliberation, and drafting required to complete this merits decision, for which the Court offers apologies to the parties and their counsel.

Based on the evidence admitted at trial, which was put into context by the site visit that the Court conducted prior to trial, the Court renders the following findings of fact and conclusions of law, as well as the judgment order that accompanies this merits decision.

**Findings of Fact**

I. **Background**

1. Clark W. Hinsdale, III, holds legal title to several parcels of land in Charlotte, Vermont ("Town"), as Trustee for the Clark Hinsdale, Jr. Testamentary Trust.

2. The pending application requests approval of a proposed realignment of the boundary line that divides two parcels currently held by Applicant and located on or near Hinesburg Road and Spear Street in Charlotte. One of these parcels is commonly known as "the Leclair Parcel," which contains 46.03± acres; the second parcel is known as "the Eno Woodlot," which contains 33.63± acres. Both parcels are generally undeveloped, with the exception of the solar array on the Leclair Parcel described below.

2

3. The Leclair Parcel has frontage on Hinesburg Road along the parcel's southern boundary. The Eno Woodlot has no road frontage, although it benefits from a 60-foot-wide right-of-way running from the parcel's eastern boundary to Spear Street to the east.

4. Each of these two parcels is entirely located in the Rural Zoning District ("RUR District").

5. The lands within both parcels have characteristics that are included within the Regulations' definition of "Areas of High Public Value": (a) some of the lands are in active agricultural use; (b) some portions of the parcels contain primary agricultural soils; (c) some of the lands, particularly the northern portion of the Eno Woodlot, contain wildlife habitat; and (d) the northern portion of the Eno Woodlot is adjacent to other conserved lands. See Charlotte, Vt., Land Use Regulations tbl. 7.1 (Regulations).

II. **Solar Array Development**

6. A portion of the Leclair Parcel has been developed with a 2.2 megawatt solar electric generation facility ("solar array") that was installed and is operated by Charlotte Solar, LLC pursuant to a certificate of public good issued by the State of Vermont Public Service Board ("PSB") on January 22, 2013. The PSB approval was admitted at trial as Applicant's Exhibit 5. That approval was amended by order of the PSB pursuant to a stipulation between Charlotte Solar and the Town (a copy of that stipulation was admitted at trial as Exhibit 6). The solar array and site plan were revised pursuant to a condition imposed by the PSB; a copy of that PSB approval, with attached revised site plan, was admitted at our trial as Exhibit 7.

7. The completed solar array occupies about 12 acres of the Leclair Parcel; this 12± acre portion of the Leclair Parcel is enclosed with metal and wire mesh fencing, as security for the solar array.

8. As situated by the PSB approval, the solar array is located near the center of the Leclair Parcel, with the closest solar panels 765± feet from Hinesburg Road to the south, 148± feet from the western boundary of the Leclair Parcel, 541± feet from the northern boundary with the Eno Woodlot, and 210± feet from the eastern boundary of the Leclair Parcel.

9. Charlotte Solar had originally requested that the solar array be located closer to the boundary along Hinesburg Road. Due to requests from adjoining neighbors, the PSB

3

conditioned its approval on the solar array being located more to the center of the Leclair Parcel.

10.    The PSB approved a 50-foot-wide right-of-way running from Hinesburg Road and over the Leclair Parcel to serve as the access to the solar array.

11.    The certificate of public good allows for the lease or sale of the land occupied by the solar array, subject to necessary state and local permit approval.

12.    The PSB approval was not appealed and has become final.

**III.    Surrounding Neighborhood**

13.    To the east of the Leclair Parcel and the Eno Woodlot are several developed and undeveloped lots that have frontage on Spear Street. This residential subdivision development is sometimes referred to as "the Sheham Green Development." Two of the larger undeveloped lots are owned by Applicant. Five of the developed lots are smaller in size and are used as residences. Two other smaller parcels, located along the eastern side of the southern boundary of the Leclair Parcel, are also developed as residences; one of those two properties is owned by Stephan Colvin, who appears in this proceeding as an Interested Person.

14.    To the west of the Leclair Parcel and the Eno Woodlot is a large parcel of land held by Nordic Holsteins, LLC. Applicant is a member of that limited liability company. The Nordic Holsteins parcel is used for agricultural purposes.

**IV.    Boundary Adjustment Application**

15.    Applicant proposes to realign the boundary between the Leclair Parcel and the Eno Woodlot such that a new parcel, to be known as Parcel 1, would encompass the land occupied by the solar array and the fencing surrounding the array. The northern and southern boundaries of Lot 1 would extend to the eastern boundary of the former Leclair Parcel; the proposed Lot 1 would consist of 14.65± acres. Applicant's proposal is depicted in Applicant's Exhibit 12, which this Court adopts. A reduced copy of Applicant's Exhibit 12 has been attached to this decision.

16.    The existing boundary line between the Leclair Parcel and the Eno Woodlot bisects the open land that is currently used for rotational grazing. If the existing boundary line is left unchanged, separate ownership of the two existing parcels could lead to a reduction in the

4

lands available for agricultural purposes, since the available agricultural lands would be separated into several smaller lots.

17. Applicant offered a specific metes and bounds description for Lot 1 and the proposed right-of-way that benefits Lot 1; that description was admitted at trial as Exhibit 8.

18. The proposed Lot 2 would consist of all the remaining lands of the former Leclair Parcel and the entirety of the Eno Woodlot. All of the lands in the proposed Lot 2, consisting of 65.01± acres, are presently undeveloped.

19. The proposed realignment of the boundary line will allow for all undeveloped lands remaining from the Leclair Parcel to be held in common with all of the lands that now encompass the Eno Woodlot. This boundary line adjustment effectively brings together these undeveloped lands, thereby assisting the agricultural uses for these lands.

20. The 2± acres of Lot 1 that are neither occupied by the solar array nor enclosed by the existing fencing would also continue to be used for agricultural purposes. These lands, together with the open lands on Lot 2, have and will continue to be used for rotational grazing purposes, much like the adjoining lands owned by Nordic Holsteins, LLC.

21. Pursuant to the stipulation reached with the Town, Applicant has proposed to abide by the following conditions, which would limit further use and development of the proposed lots. Applicant proposes that these conditions be incorporated into any approval of its proposed boundary adjustment application. A copy of the stipulation was admitted at trial as Exhibit 4.[2]

    a. Access for both Lots 1 and 2 would be from Hinesburg Road over a 50-foot-wide right-of-way that would travel on Lot 2 in the same area as the right-of-way approved by the PSB. This right-of-way would continue to provide access to the solar array and would also serve as access to all lands within Lot 2.

    b. The existing right-of-way to Spear Street that currently benefits the Eno Woodlot shall no longer be used for ingress and egress. Rather, it shall only be used for agricultural, forestry, or recreational purposes.

    c. Due to the extensive area within Lot 2 that is of high public value, Applicant, its successors, and assigns may not conduct any regulated development on Lot 2 without first submitting a master plan for proposed development and obtaining approval of that master plan from the Planning Commission.

---

[2] As noted below in our conclusion section, we attach a copy of the stipulation between Applicant and the Town (Exhibit 4) to this decision and adopt its conditions by this reference. Our text above *is not* a verbatim reference, but rather a summary of the substantive conditions contained in the stipulation.

d.  Development of the northern portion of Lot 2 is to be further restricted, in that the portion of Lot 2 more than 2,300 feet north of Hinesburg Road shall be designated as a permanent "no build area."  No structure of any type may be located in this area, and any development of any type of road in this area is subject to the Planning Commission's master plan review and approval.

e.  The Town supports this proposed boundary line adjustment, even though the new proposed lots do not detail building envelopes, since no buildings are proposed or approved on either Lots 1 or 2.

### Conclusions of Law

We first note that since Applicant is the only party that appealed the Planning Commission determination, we look only to the legal issues posed by Applicant in his Statement of Questions.  Just prior to trial, Applicant entered into a stipulation with the Town, whereby Applicant agreed that certain conditions could be included in the Court's approval of Applicant's boundary adjustment application, and the Town agreed that the application should be approved, subject to the agreed-upon conditions.  Thus, we were presented at trial with a modified application.  Based upon those modifications, we regard as **MOOT** certain questions initially posed by Applicant.  Specifically we regard as moot all questions that asserted that a regulatory review was preempted or that the pending application was exempt from municipal regulation, those being Questions 1 (in part), 2, 4, 5, 6 (in part), 7, 8, 10, and 11.  We also regard as moot the questions Applicant initially posed that assert that the pending application should be approved *without any conditions*, those being Questions 3 and 9.  Further, since Applicant has now, by its stipulation with the Town, advocated for conditional approval of its application under the applicable subdivision standards contained in Article VII of the Regulations, we regard as waived the questions that challenge the enforceability of the Regulations' subdivision standards, those being Questions 15 and 16.

We therefore limit our review in this appeal to the remaining questions. Questions 1 and 6 ask whether the proposed boundary adjustment conforms to all applicable subdivision standards.  Questions 12 through 14 and 17 all ask, in a variety of ways, whether the proposed Lot 2 should be regarded as "irregular," as that term is defined and used in the Regulations. The final pending question, Question 18, asks whether the Regulations "specifically recognize

6

that public utility power generating plants and transmission lines can be built in all Zoning Districts?" We therefore turn to these three legal issues.

**I.      Conformance with Applicable Subdivision Standards**

The first issue is whether Applicant's proposal conforms to the applicable provisions of the Regulations (Applicant's Questions 1 and 6). We believe it important to note at the outset that the substance of the pending application *does not* seek approval for the creation of a new independent lot, but rather seeks approval for the adjustment of a boundary line between two already existing lots, both of which are owned by Applicant and will, for at least the near future, continue to be owned by Applicant. Applicant also does not propose any form of regulated development on either of these lots, and the conditions and development restrictions proposed by the Town and Applicant would continue to encumber the land, even if title to either parcel is passed to a third party. See Regulations § 7.1(4) (authorizing the Court to impose appropriate conditions on boundary line adjustment approvals); In re Hildebrand, 2007 VT 5, ¶ 11, 181 Vt. 568 (holding that subdivision permit conditions are binding an landowner's successors in interest when landowner fails to appeal).

Nonetheless, Section 6.1(C)(3) of the Regulations classifies "Boundary Adjustment[s]" as a form of subdivision and subjects proposed boundary adjustments to final plan approval under Section 6.5 and the subdivision review standards in Chapter VII of the Regulations. We therefore embark upon a review of the application's conformance with these provisions.

The parties have stipulated that Sections 7.4 through 7.9, Section 7.10(A), Section 7.11(A) and (B), and Section 7.12 do not apply to this appeal. We therefore focus our analysis on final plan approval under Section 6.5 and the remaining subdivision standards contained in Chapter VII of the Regulations: Sections 7.1 through 7.3, 7.10(B), and 7.11(C).

a.      Section 6.5

With regard to Applicant's compliance with the final plan approval procedures in Section 6.5, Interested Party Colvin has suggested that we must regard the pending application as incomplete, since Section 6.5 requires an applicant to "clearly identify and delineate the boundaries of all Areas of High Public Value, as defined in Section 7.2(A)" so that "[a]ppropriate management strategies [can] be identified to ensure their preservation to the extent feasible."

7

Regulations § 6.5, tbl. 6.3.[3]  Applicant has represented that the entirety of Lot 2 and the undeveloped portion of Lot 1 consist of areas of high public value.  While Applicant has not clearly delineated high value areas on the developed portion of Lot 1, development on this portion of Lot 1 has already been accomplished under a certificate of public good from the PSB.  It is therefore outside the scope of our reviewing jurisdiction, since the PSB has exclusive jurisdiction over review of power generation facilities.  See 30 V.S.A. § 248(a)(2)(A); see also City of South Burlington v. Vt. Elec. Power Co., 133 Vt. 438, 448 (1975) (holding that electric generation facility was not required to secure a municipal zoning permit for a facility already sanctioned by the PSB through a certificate of public good).  Because the underlying purpose of the delineation requirement is to identify "[a]ppropriate management strategies" for high-value lands, and any such management strategies for the area occupied by the solar array would be beyond our jurisdiction, we reject, respectfully, Mr. Colvin's suggestion and conclude that Applicant has provided sufficient identification of the areas of high public value within his property.

b.    Section 7.1

Section 7.1 of the Regulations provides the Planning Commission, and on appeal this Court, with the discretion to impose four additional requirements or conditions upon a proposed subdivision: (1) disclosure of the intended uses of the subdivided land; (2) a master plan for the entire subdivided parcel if development is likely; (3) independent technical review of the proposed subdivision; and (4) modification of the subdivision or conditional approval to ensure conformance.  Regulations § 7.1(1)–(4).

Applicant here, through his stipulation with the Town, has agreed that the Court may impose the first two discretionary requirements in Section 7.1 by (1) disclosing the intended use of the land (solar array on Lot 1 and agricultural or restricted development on Lot 2) and (2) stipulating that a master plan be filed and approved by the Planning Commission before any future regulated development occurs on Lot 2.  Prior to any such development, Lot 2 is likely to

---

[3] Table 6.3 is located within the body of Section 6.5 of the Regulations, and it uses mandatory language. We note, however, that unlike Table 6.2 (which is also located in the body of Section 6.5), Table 6.3 is not referenced in the text of Section 6.5.  We nonetheless interpret Table 6.3 to be part of Section 6.5 and to impose standalone requirements.

8

continue to be put to agricultural uses; the northern portion of Lot 2 will be subject to a permanent "no build" condition.  Thus, Applicant has conformed to the discretionary conditions contained in Subsections 7.1(1) and (2).  Since Lot 1 is already developed and no further development is envisioned in the immediate future for the southern portion of Lot 2 (and regulated development on the northern portion will be permanently barred), we conclude that no purpose is served by requiring an independent technical review under Section 7.1(3) for such a low-impact subdivision.  The conditions in the Town and Applicant's stipulation will ensure that the proposed boundary adjustment will conform to the applicable subdivision standards, for the reasons more fully detailed below, and we therefore impose these proposed conditions under Section 7.1(4) of the Regulations (a full copy of the stipulation is attached to this decision).  Given the low-impact nature of the proposed boundary line adjustment, we see no reason to impose any conditions or modifications other than the conditions recommended by Applicant's stipulation with the Town.  Having exercised the appropriate discretion afforded by this Regulation, we conclude that the proposed boundary adjustment conforms to Section 7.1 in its entirety.

    c.    <u>Section 7.2</u>

Section 7.2 establishes general standards for permitted subdivisions.  Most notably, Section 7.2 provides "to the extent feasible, land development should not have an undue adverse impact on Areas of High Public Value."  Table 7.1 defines the characteristics of "Areas of High Public Value."  All parties agree that the entirety of Parcel 2 and the undeveloped portion of Lot 1 consist of areas of high public value, due to the presence of primary agricultural soils in the southern portions of Lot 2 and the undeveloped portion of Lot 1 and wooded wildlife habitat in the northern portion of Lot 2.  Much of the southern portions have been in active agricultural use; nearly all of the lands within Lot 2 are adjacent to other lots with conserved lands and on which agricultural uses have occurred and are continuing to occur.  Thus, we conclude that all Lot 2 lands and the 2±-acre undeveloped portion of Lot 1 consist of areas of high public value, as defined by Table 7.1.

The remaining lands contained in Lot 1 may also have high-public-value characteristics, but they have already been developed to host the solar array pursuant to the certificate of

9

public good issued by the PSB. Since this development has already been accomplished, a boundary line adjustment will not have an "undue or adverse impact" on those lands. Furthermore, only the solar array development has been authorized by the certificate of public good and no further development of Lot 1 is authorized. To the extent that Lot 1 ceases to host the solar array, it is most likely that the Lot 1 lands will revert to agricultural use; those lands may not be put to other regulated uses without first receiving approval for a master plan and a specific development plan, pursuant to the conditions proposed by both the Town and Applicant. Far from having an undue adverse impact on areas of high public value, the boundary line adjustment will have a beneficial impact, since it will consolidate and protect areas of high public value. We therefore conclude that Applicant has satisfied the general requirements of Section 7.2.

The fact that Applicant proposes no regulated development on either Lot 1 or 2, that all lands are relatively flat or gently sloping, and that the parcels are of a size well in excess of the 5-acre minimum lot size required within the RUR District, see Regulations § 2.3 tbl. 2.5, allows for a relatively quick review of the remaining subsections in Section 7.2 (except Subsection 7.2(C)(5), which is addressed separately in Part II of this decision). See Regulations §§ 7.2(A)–(E). Specifically, the proposed boundary adjustment:

(A) does not designate development in any areas restricted from development by Section 7.2(A) of the Regulations;

(B) does not conflict with the applicable provisions of the Town of Charlotte Town Plan ("Town Plan") or other applicable municipal regulations or capital plan, see Regulations § 7.2(B);

(C) does not bring these lots into conflict with the applicable municipal regulations, including size; frontage; and water, wetland, and shoreland setback and buffer requirements. See Regulations § 7.2(C). In addition, the proposed boundary adjustment:

   (1) does not create new conflicts with the applicable minimum lot size, frontage, density or right-of-way access regulations, see Regulations § 7.2(C)(1);

   (2) does not require adjustment in lot size because there are no site limitations or physical or natural features that would warrant a change to the proposed lot sizes, see Regulations § 7.2(C)(2);

10

(3) creates lots that are of a sufficient size and have either road frontage or right-of-way access to meet the applicable regulations, including applicable setback space, in the event of future development, see Regulations § 7.2(C)(3);

(4) creates lots that have side lot lines that generally form right angles to Hinesburg Road or Spear Street, see Regulations § 7.2(C)(4); and

(5) conforms with the regularity requirements in Subsection 7.2(C)(5). See _infra_, Part II.

(D) does not conflict with the applicable density regulations, see Regulations § 7.2(D);

(E) does not conflict with the requirement that proposed lots include designated building envelopes, see Regulations § 7.2(E), since, under the conditions imposed by this decision, no development will occur unless and until a master plan application is made and approved and a permanent "no build area" will be maintained on the northern portion of Lot 2;

(F) does not require temporary markers or monuments to be installed in order to assist in evaluating the proposed layout. See Regulations § 7.2(F). We will only require Applicant to install permanent markers or monuments along the adjusted boundary line, as recommended by his land surveyor.

In light of these determinations, we conclude that the proposed boundary adjustment conforms to all applicable provisions of Section 7.2 of the Regulations.

d.    Section 7.3

We turn now to Section 7.3 of the Regulations, which impose "District Standards" for subdivisions. Section 7.3(A) directs that a pending subdivision be "designed to achieve the purpose, objectives, and intended settlement pattern of the zoning district(s) in which it is located, as defined in Chapter II and the _Charlotte Town Plan_." Subsections 7.3(1) and (2) require that the subdivision "maintain and extend traditional or planned settlement patterns, including lot areas and configurations" and "maintain contiguous tracts of open land with adjoining parcels, including but not necessarily limited to Areas of High Public Value . . . ." Subsection 7.3(A)(3) requires subdivisions to "connect with and extend existing roads, trails, and utility corridors." Subsections (B) and (C) pertain to other zoning districts and are therefore not applicable to the pending application. Subsection 7.3(D) imposes specific district standards for the RUR District.

Turning first to the general requirement under Section 7.3(A) that subdivisions conform to zoning district and Town Plan standards, we conclude that Applicant's proposal meets each

of the specified purposes and objectives for the RUR District.  The purposes of the RUR district, as set forth in Chapter II of the Regulations, are, in relevant part, "to protect important agricultural land and promote viable agriculture, wildlife habitat, productive woodland, natural areas, aquifers, scenic vistas and views, open spaces, and other significant natural, cultural and scenic resources identified in the *Charlotte Town Plan . . . .*"  The Town Plan also provides a strategy for development in rural areas: "During development review, Areas of High Public Value will be identified and prioritized based on the qualities and relative values of each resources.  This analysis will be site specific, but will also consider resources in a broader context as appropriate."[4]  Charlotte, Vt., Town Plan at 99 (Mar. 5, 2013) (admitted at trial as Exhibit 2).

Applicant's proposal preserves open and wooded areas of high public value and will assure their preservation because of the conditions proposed in Applicant's Stipulation with the Town.  These agreed-upon restrictions and outright prohibitions on development will preserve these important undeveloped lands into the future.  That preservation complements the adjacent agricultural lands held by Nordic Holdings, LLC.  Finally, the proposed boundary adjustment will merge the important undeveloped lands that are currently held in two separate parcels: the Leclair Parcel and the Eno Woodlot.  This merger will bring together into one lot, the proposed Lot 2, all remaining undeveloped lands from these parcels.  This unification will help preserve the agricultural character of these lands because it will bring together into one lot (the proposed Lot 2) lands that are currently held in two lots that bisect the high value lands. Finally, as explained above, the proposed boundary line adjustment, though the suggested conditions, preserves the currently undeveloped areas of high public value on the site, and therefore accords with the Town Plan.

Because Applicant does not propose development on Lots 1 or 2, the boundary line adjustment complies with Subsections 7.3(A)(1) and (2), which require subdivisions to maintain traditional settlement patterns and contiguous open land.

---

[4] This section of the Town Plan also references an "Open Space and Conservation Action Plan" that is "currently under development."  See id.  Because the parties have not represented to the Court that such a plan exists or that it should be considered, the Court has disregarded this provision.

The proposal also will allow all undeveloped lands to be accessed via one common right-of-way and will cease the use of the Eno Woodlot right-of-way to Spear Street except for agricultural, forestry, or recreational purposes. Thus, we conclude that the proposed development conforms to the requirement that subdivisions connect with existing roads, as directed by Subsection 7.3(A)(3) of the Regulations. For all these reasons, we conclude that the proposed boundary adjustment conforms to Subsection 7.3(A) of the Regulations.

We further conclude that the proposed boundary adjustment conforms to Subsections (D)(1) through (5), which establish district standards for the Rural, Shoreland, and Conservation Zoning Districts. We reach this conclusion for the following reasons:

(1) No building or other regulated development is proposed in connection with the boundary line adjustment, and therefore no adverse impact will be suffered by the areas of high public value as a consequence of proposed development. The application therefore conforms to Subsection 7.3(D)(1).

(2) The proposed boundary line adjustment does not create parcelization, fragmentation, isolation, or destruction of any areas of high public value, nor will any undue adverse impacts be caused by such prohibited actions. In fact, the proposed boundary line adjustment will bring together into one lot all the remaining undeveloped areas of high public value. The application therefore conforms to Subsection 7.3(D)(2).

(3) A single right-of-way will serve the two reconfigured lots. This right-of-way will follow the roadway that the PSB approved when it issued the certificate of public good for the now-completed solar array. The existing right-of-way that benefits the Eno Woodlot will only be used for agricultural, forestry, or recreational purposes. The shared right-of-way will not fragment areas of high public value. The application therefore conforms to Subsection 7.3(D)(3).

(4) All of the undeveloped lands on the proposed Lots 1 and 2 are areas of high public value. The wooded and wildlife areas on the northern portion of Lot 2, specifically designated as all Lot 2 lands more than 2,300 feet north of Hinesburg Road, are designated as a "no build" area. No regulated development has been proposed for these areas. Further, pursuant to the permit conditions in the stipulation between the Town and Applicant, the "no build" area will be permanently conserved and all other areas will remain undeveloped unless Applicant submits a master plan and the Planning Commission approves it. The application therefore conforms to Subsection 7.3(D)(4).

(5) No regulated development is proposed on the currently undeveloped lands, so no consideration of clustering is warranted. The application therefore conforms to Subsection 7.3(D)(5).

13

(6) Since the proposed Lot 2 will consist of 65.01± acres, the proposed boundary adjustment will not interfere with the eligibility of the lands for any state and municipal tax abatement programs, nor will it interfere with the effective management and long-term conservation of those lands. The application therefore conforms to Subsection 7.3(D)(6).

Finally, Subsection 7.3(D)(6) gives the Planning Commission or this Court the power to "encourage applicant to configure lots [so that they are] of a size necessary to remain eligible for state and municipal tax abatement programs" and to "enable effective management and/or long term conservation." This provision most notably implicates a state tax abatement program, commonly known as the Current Use Program, that provides property tax benefits for owners of active agricultural and forest land.[5] See 32 V.S.A. §§ 3750, et seq. That program generally requires lots to be 25 acres or larger to be eligible for enrollment. See 32 V.S.A. § 3752(1) (defining agricultural land); id. § 3752(9)(A) (defining forest land). The proposed boundary line adjustment will increase Lot 2 to over 65 acres. This land will therefore "remain eligible" for the current use program (though there was no evidence at trial that it is currently enrolled). While the proposed Lot 1 will be smaller than 15 acres, this land is likely already ineligible for the Current Use program, since it is developed and no longer in agricultural or forestry use. We therefore find the purposes of Subsection 7.3(D)(6) satisfied, and see no need to "encourage" applicant to re-configure his proposed lots to maintain tax abatement eligibility.

For all these reasons, we conclude that the proposed boundary adjustment conforms to all applicable Subsections of Section 7.3 of the Regulations.

e. Section 7.10(B)

Acknowledging that the parties stipulated that Subsections 7.4 through 7.10(A) are not applicable to the pending application, we turn to Subsection 7.10(B). Our analysis is brief, because we conclude that that Subsection is also not applicable to the pending application. It governs "subdivisions intended for development." Since no regulated development is proposed by this boundary line adjustment application, we conclude that Subsection 7.10(B) of the Regulations does not apply.

---

[5] This is also the only tax abatement program the parties addressed at trial or in their briefing.

f.     Section 7.11(C)

Subsection 7.11(C) contains the final subdivision standard applicable to the pending application; it is entitled "Lands to be Conserved."  This provision encourages (but does not require) all areas of high public value to be held in a single lot.  Regulations § 7.11(C).  Applicant has essentially accomplished that goal by the proposed boundary line adjustment, since nearly all valued areas will now be held in Lot 2.  The remaining language contained in Subsection (C) speaks to how legal title or an easement to the land being "conserved" or "preserved" may be held, but this language speaks in permissive and not regulatory language.  Applicant has pledged that the northern portion of Lot 2, which will consist of nearly all of the Eno Woodlot, will be held as a permanent "no build" area, and has further agreed that no regulated development will occur on the remaining portion of Lot 2 unless and until a master plan has been submitted and approved by the Planning Commission.  This accomplishes the discretionary conservation goals in Subsection 7.11(C).  We therefore conclude that the proposed boundary adjustment conforms to all regulatory provisions in Section 7.11(C) of the Regulations.

**II.     Irregularity of Lot 2**

The parties spent much time at trial arguing over whether the layout of Lot 2 results in an "irregular lot."  This legal issue is the subject of Applicant's Questions 12, 13, 14, and 17, all of which we understand to make direct or implied reference to Subsection 7.2(C)(5) of the Regulations.  Subsection 7.2(C)(5) provides, "Irregularly shaped lots (e.g., with curves, jogs, doglegs; excessively rectilinear, etc.) shall not be created unless warranted by topography, surface waters, or to avoid the fragmentation of significant natural or cultural features." For the reasons stated below, we conclude that the boundary line adjustment complies with Subsection 7.2(C)(5).

The proposed boundary takes nearly all lands not occupied by the solar array and merges them into a single lot.  Applicant acknowledges that the shape of Lot 2 does not consist of four unified side boundaries.  Lot 2 is shaped as a long rectangle, with a jog to eliminate the land occupied by the solar array, together with the two additional acres so that the eastern boundary of Lot 1 extends to the eastern limits of the Applicant's property.  See Exhibit 12.  In

effect, Lot 2 is best described as an elongated capital "C", with a box on its northern edge that includes all remaining lands of the Eno Woodlot. Id.

Given that the proposed boundary adjustment respects the finality of the solar array approval and development, we do not regard the shape of Lot 2 as irregular. In making this determination, we rely upon two important factors. First, the proposed boundary adjustment application is unlike a conventional minor subdivision, in that it effectuates a merging of lands, rather than a fragmentation. Applicant's two existing lots bifurcate the high value lands between the Leclair Parcel and the Eno Woodlot; the former parcel host mixed uses, which include the solar array on a 12± acre portion and rotational grazing on its remaining 34± acres. The proposed boundary adjustment segregates the solar array within Lot 1 and merges all undeveloped high-value lands on Lot 2. Further, the proposed boundary adjustment creates no new lots: Applicant enters this process with two separate lots and will leave this process with two separate lots, albeit with unified uses on each lot and with added restrictions on the development of the high-value lands.

We do not believe it appropriate to limit our thought process by defining a "regular lot" in terms of square or rectangular shapes; to do so would likely require Applicant's property to be carved into four or more separate parcel, a process which would bifurcate the high-value lands. Many parcels of land in Vermont do not effectuate such a neat, cookie-cutter design, since land to be subdivided often must recognize the natural limits of the land, including an applicant's original boundary limits. Furthermore, the Regulations do not require this kind of exactitude, and allow for irregularities when they are "warranted by topography, surface waters, or to avoid the fragmentation of significant natural or cultural features." Regulations § 7.2(C)(5). Requiring Applicant to maintain the existing boundary lines would be worse than the proposed adjustment, since it would result in the bifurcation of important lands and would not bring about the restrictions on development of those important lands that has resulted from the stipulation that Applicant reached with the Town.

With the guidelines from all the subdivision standards in mind, we conclude that the resulting shapes of Lots 1 and 2 are not irregular, but rather are shaped so as "to avoid the fragmentation of significant natural or cultural features." See Regulations § 7.2(C)(5). We

16

therefore conclude that the proposed boundary adjustment conforms to Section 7.2(C)(5) of the Regulations.

### III.  Recognition of Electric Generation Facilities in All Zoning Districts

Lastly, we address Applicant's Question 18, which asks whether the Regulations "specifically recognize that public utility power generating plants and transmission lines can be built in all Zoning Districts."  Applicant's Statement of Questions at 3, filed on Aug. 25, 2014. Much trial time was consumed by discussions of the solar array already installed on Applicant's property.  However, we decline to address this question, since it asks us to opine on a legal issue that is not presented by the pending application.  Applicant seeks approval of his proposed boundary line adjustment.  That approval is governed by Section 6.5 and Chapter VII of the Regulations, and those provisions do not require us to opine on the general legal question that Applicant poses; to respond to Applicant's last question would therefore result in this Court rendering an impermissible advisory opinion.  See In re Appeal of 232511 Investments, Ltd., 2006 VT 27, ¶ 19, 179 Vt. 409 (concluding that a legal question not presented by the application on appeal "is hypothetical, and any conclusion . . . reach[ed] would be advisory.").

Furthermore, the solar installation has already been approved by the PSB, which enjoys exclusive jurisdiction over the permitting of electric generating installations.  See 30 V.S.A. § 248(a)(2)(A); see also City of South Burlington v. Vt. Elec. Power Co., 133 Vt. 438, 448 (1975). The PSB approval of Applicant's solar array is final and cannot be challenged in this litigation. Therefore, we decline to answer Applicant's last question of whether such a facility is allowed in the RUR District, or any other zoning district for that matter, because that question is not germane to the pending application and is not raised by the applicable subdivision standards in Section 6.5 and Chapter VII of the Regulations.

### Conclusion

For all the reasons stated above, we conclude that the application of Applicant Clark W. Hinsdale, III, as Trustee of the Clark Hinsdale, Jr. Testamentary Trust, for approval of the proposed boundary line adjustment conforms to all applicable provisions of the Land Use

17

Regulations for the Town of Charlotte, Vermont, and therefore do hereby **APPROVE** that application, subject to the following conditions:

1. Applicant shall cause his land surveyor to prepare a mylar copy of the site plan in recordable form, signed by the surveyor, and recorded in the Town of Charlotte Land Records;

2. Applicant shall cause permanent survey markers to be installed to memorialize the approved boundary line; and

3. Conditions 1 through 10 from the stipulation entered into by Applicant and the Town of Charlotte, a copy of which was admitted at our trial as Exhibit 4.

This matter is remanded to the Town of Charlotte Zoning Administrator, solely to perform the ministerial act of issuing a zoning permit that conforms to the determinations and conditions contained in this merits decision.

This completes the current proceedings before this Court. A judgment order accompanies this merits decision.

Electronically signed on January 5, 2016 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division

18